**AFFIRMED and Opinion Filed July 3, 2024**



**In The**
**Court of Appeals**
**Fifth District of Texas at Dallas**

**No. 05-23-00116-CV**

**JULIO & SONS COMPANY, ET AL., Appellants**
**V.**
**CONTINENTAL CASUALTY COMPANY, Appellee**

**On Appeal from the 44th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. DC-21-02194**

## OPINION

Before Justices Nowell, Miskel, and Kennedy
Opinion by Justice Nowell

This case involves an insurance coverage dispute between appellants (two restaurant groups collectively referred to as UJB) and appellee Continental Casualty Company. UJB filed a claim under a commercial property insurance policy for business interruption losses, among others, resulting from the COVID-19 pandemic. After Continental denied coverage because UJB did not establish any "direct physical loss of or damage to" their restaurants, UJB filed suit. Continental moved for summary judgment relying, in part, on Fifth Circuit and other federal circuit courts' and state courts' conclusions that COVID-19 does not cause direct physical

loss of or damage to property as is necessary to trigger insurance overage. The trial court granted Continental's motion for summary judgment. UJB challenges the trial court's order on numerous grounds. We affirm.

**Background**

UJB owns Uncle Julio's, Hacienda Colorado, and Bartaco restaurant chains. It operates approximately a dozen restaurants in Texas and fifteen restaurants in other states. UJB purchased an insurance policy (the Policy) from Continental in 2019 that covered any property losses for the October 30, 2019 through October 30, 2020 time period. The Policy broadly covered, among other things, "risks of direct physical loss of or damage to" any real or personal property, all "time element" losses for business interruption, losses due to orders of a "civil authority," and extra expenses associated with such losses. The Policy provided these coverages "except as hereafter excluded" but contained no exclusion for viruses.

After COVID-19 was declared a worldwide pandemic in early 2020, government officials around the country issued business restriction and stay-at-home orders and encouraged social distancing in an effort to reduce the spread of the deadly virus. UJB temporarily shut down restaurant operations in some locations and permanently closed in others. Thereafter, UJB submitted an insurance claim to Continental seeking coverage under the following provisions: (1) Business Interruption, (2) Denial of Access by Civil Authority, (3) Ingress-Egress, (4) Contingent Business Interruption, (5) Extra Expense, (6) Leasehold Interest,

–2–

(7) Expenses Related to Reducing Loss, (8) Extended Period of Indemnity, (9) Loss Adjustment Expense, and (10) Professional Fees. On June 13, 2020, Continental denied coverage, in relevant part, because "[y]ou have not claimed that [UJB]'s operations were suspended because of any direct physical loss of or damage to property . . . and our investigation has revealed no evidence of such physical loss or damage."

On February 19, 2021, UJB filed an original petition requesting declaratory relief and alleged, in relevant part:

> From March 2020 through the present, as a direct result of the COVID-19 pandemic and related government orders, UJB has suffered, and continues to suffer, physical loss of and damage to its covered property and severe "time element" losses and other covered losses and expenses due to necessary business interruptions of, and the prohibition of access to, its numerous Uncle Julio's and Bartaco restaurants and other property.

UJB further asserted claims for breach of contract, breach of the implied covenant of good faith and faith dealing, and violations of the Texas Insurance Code. Continental filed a general denial.

The parties agreed to phased discovery. Phase I was limited to discovery related to UJB's declaratory judgment and breach-of-contract claims. Phase II, if needed, would include the extracontractual claims and alleged damages. After the initial round of document production and depositions, the parties stayed additional discovery to allow Continental to move for summary judgment on the limited ground

–3–

that UJB could not establish coverage under any Policy provisions. The parties also entered a Joint Factual Stipulation, which we quote as follows:

- No physical property at any covered restaurant location was tested for the presence of the coronavirus on property at any covered restaurant location at any time.

- No fact witness for Plaintiffs had personal knowledge of information confirming the physical presence or non-presence of the coronavirus on any covered property at any covered location.

- No fact witness for Plaintiffs had personal knowledge of any property at any covered restaurant location that was different in appearance or potential function, or that was missing or no longer in Plaintiffs' physical possession because of the presence of the coronavirus.

- No fact witness for Plaintiffs has personal knowledge of any property at any covered restaurant location that was different in appearance or potential function, or that was missing or no longer in Plaintiffs' physical possession, because of the presence of the coronavirus at the time the restaurant first reduced indoor dining capacity, discontinued indoor dining, and/or discontinued outdoor dining in or around March 2020.

- No fact witness for Plaintiffs has personal knowledge of information confirming that any person who contracted COVID-19 became infected by touching covered property at any restaurant location, or by entering a covered restaurant location.

- After each covered restaurant location first reduced indoor dining capacity, discontinued indoor dining, and/or discontinued outdoor dining in or around March 2020, some restaurant employees, management, customers, and/or third-party vendors were permitted to continue to enter the restaurant location for various purposes.

- Executive management of Uncle Julio's and [B]artaco made the decisions to reduce dining capacity or to suspend any operations at each of their respective covered locations related to the COVID-19 pandemic.

–4–

- The references to "[n]o fact witness" in the stipulations above include executive management of Uncle Julio's and [B]artaco.

On February 15, 2022, Continental filed a traditional motion for summary judgment. It argued, in part, that the applicable policy provisions required UJB to establish "direct physical loss of or damage to" covered property at each location. It contended that "consistent with [UJB's] internal pre-litigation assessment" and "hundreds of federal and state courts around the country, including at least 22 decisions by Texas courts," the coronavirus that causes COVID-19 does not, as a matter of law, cause direct physical loss of or damage to property.

Alternatively, even if COVID-19 could cause direct physical loss of or damage to covered property, Continental argued any such loss or damage did not cause a necessary interruption of UJB's business. Although most restaurants discontinued on-premises dining beginning in March 2020, a majority continued offering takeout and delivery services, resumed outdoor dining in subsequent weeks, and resumed reduced-capacity indoor dining by July 2020. Accordingly, Continental maintained UJB closed its restaurants in response to civil authority orders at a time when it was experiencing declining sales, and as soon as local restrictions permitted, UJB resumed on-premises dining at most of its locations despite COVID-19 continuing to spread through communities.

In its response, UJB argued that Continental did not meet its initial burden of establishing its entitlement to judgment as a matter of law, and the summary judgment burden never shifted to UJB as the non-movant. Alternatively, UJB

contended it presented more than a scintilla of evidence to raise a genuine issue of material fact to overcome summary judgment.

UJB also encouraged the trial court not to "follow the herd" of non-binding federal and state case law concluding COVID-19 did not cause direct physical loss of or damage to property as a matter of law because the cases were factually distinguishable and conclusory in their analyses regarding the impact of COVID-19 on property. UJB presented a different theory. It argued, in part, that the physical impact of infectious virus particles on restaurant surfaces and in indoor air constituted "direct physical loss of or damage to property" under Texas law. Further, it asserted each restaurant suffered necessary business interruptions because the coronavirus caused the direct physical loss of or damage to each of its properties. UJB attached thousands of pages of documents to its response, including expert reports and affidavits of corporate executives.

On December 29, 2022, the trial court granted Continental's motion for summary judgment and dismissed all of UJB's claims. UJB filed a motion for new trial, which the trial court denied on March 23, 2023. This appeal followed.

**Standard of Review**

We review a summary judgment de novo. *Trial v. Dragon*, 593 S.W.3d 313, 316 (Tex. 2019). A traditional motion for summary judgment requires the moving party to show no genuine issue of material fact exists, and it is entitled to judgment as a matter of law. TEX. R. CIV. P. 166a(c); *Lujan v. Navistar, Inc.*, 555 S.W.3d 79,

84 (Tex. 2018). If the movant carries this burden, the burden shifts to the nonmovant to raise a genuine issue of material fact. *Lujan*, 555 S.W.3d at 84. We take evidence favorable to the nonmovant as true, and we indulge every reasonable inference and resolve any doubts in the nonmovant's favor. *Ortiz v. State Farm Lloyds*, 589 S.W.3d 127, 131 (Tex. 2019).

In an insurance coverage dispute, the insured initially bears the burden to establish coverage under the policy at issue. *Gilbert Tex. Constr., L.P. v. Underwriters at Lloyd's London*, 327 S.W.3d 118, 124 (Tex. 2010); *Ryan, LLC v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, No. 05-22-00286-CV, 2023 WL 2472889, at *2 (Tex. App.—Dallas Mar. 13, 2023, no pet.) (mem. op.). When interpreting an insurance policy to ascertain the parties' intent, we construe the policy according to general rules of contract construction. *Gilbert Tex. Constr., L.P.*, 327 S.W.3d at 126. We first look to the language of the policy itself. *Id.* "We give terms their plain, ordinary, and generally accepted meaning unless the instrument shows that the parties used them in a technical or different sense." *Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118, 121 (Tex. 1996); *Ryan*, 2023 WL 2472889, at *2. Thus, when a policy defines its terms, those definitions control. *Evanston Ins. Co. v. Legacy of Life, Inc.*, 370 S.W.3d 377, 381 (Tex. 2012); *Ryan*, 2023 WL 2472889, at *2. We are also mindful of other courts' interpretations of policy language that is identical or very similar to the language at issue because "[c]ourts usually strive for uniformity in construing insurance provisions" that "are identical

–7–

across the jurisdictions." *RSUI Indem. Co. v. The Lynd Co.*, 466 S.W.3d 113, 118 (Tex. 2015) (quoting *Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. CBI Indus., Inc.*, 907 S.W.2d 517, 522 (Tex. 1995) (per curiam)); *Ryan*, 2023 WL 2472889, at *2.

## Discussion

In two issues, UJB argues the trial court erred by granting summary judgment because Continental did not establish entitlement to judgment as a matter of law and the evidence raised genuine issues of material fact regarding whether (1) COVID-19 was present in any of UJB's restaurants at the time operations were interrupted; (2) the presence of COVID-19 in any of UJB's restaurants caused the direct physical loss of or damage to property; and (3) UJB closed its restaurants because of loss or damage caused by COVID-19.

### A. *"Direct Physical Loss of or Damage to" Covered Property*

The parties first dispute whether COVID-19 was present in UJB's restaurants; however, for purposes of our analysis, we assume, without deciding, that COVID-19 was present. At the heart of this dispute, and critical to almost every coverage provision at issue, is whether COVID-19 caused a "direct physical loss of or damage to" any of UJB's covered properties; therefore, we address this overarching issue first.

The Policy does not define "physical loss" or "damage," but the parties stipulated in the trial court that the phrase "direct physical loss of or damage to property" is not ambiguous and may be construed as a matter of law.

–8–

Texas courts have interpreted "physical loss to require a tangible alteration or deprivation of the property." *See U.S. Metals, Inc. v. Liberty Mut. Grp., Inc.*, 490 S.W.3d 20, 24 (Tex. 2015) (relying on Black's Law Dictionary in defining "physical" as "of, relating to, or involving material things; pertaining to real, tangible objects"); *de Laurentis v. United Servs. Auto. Ass'n*, 162 S.W.3d 714, 723 (Tex. App.—Houston [14th Dist.] 2005, pet. denied) (explaining "physical loss is simply one that relates to natural or material things" and has been synonymous with or equivalent to damage). Recently, the Fort Worth Court of Appeals recognized "an intangible or incorporeal loss that is unaccompanied by a distinct, demonstrable, physical alteration of property is not considered a direct physical loss." *See Great Am. Ins. Co. of N.Y. v. Compass Well Servs., LLC*, No. 02-19-00373-CV, 2020 WL 7393321, at *14 (Tex. App.—Fort Worth Dec. 17, 2020, pet. denied) (mem. op.). Neither the Supreme Court of Texas nor any Texas court of appeals has addressed whether COVID-19 can cause direct physical loss of or damage to a covered property. The Fifth Circuit, along with numerous Texas federal district courts and other courts around the country, has concluded that, as a matter of law, business income losses resulting from the COVID-19 pandemic are not covered under property insurance policies requiring a direct physical loss of or damage to property. *See, e.g.*, *Terry Black's Barbecue, L.L.C. v. State Auto. Mut. Ins. Co.*, 22 F.4th 450, 458 (5th Cir. 2022) (applying Texas law and the generally accepted meaning of "physical loss" as requiring "tangible alteration of or deprivation of property");

*Cinemark Holdings, Inc. v. Factory Mut. Ins. Co.*, No. 4:21-CV-00011, 2023 WL 2588548, at *6 (E.D. Tex. Mar. 21, 2023) (applying *Terry Black's*).[1]  In reaching this conclusion, the federal courts relied on Texas case law and made an *Erie*[2] guess. *See, e.g.*, *Terry Black's*, 22 F.4th at 458 ("We conclude the Texas Supreme Court would interpret a direct physical loss of property to require a tangible alteration or deprivation of property.").[3]

The majority of jurisdictions to consider this question have concluded that although the presence of COVID-19 may render property potentially harmful to people, it does not constitute harm to the property itself.  *See, e.g.*, *id.* at 456

---

[1] In construing the definition of "physical loss" to require a tangible alteration or deprivation of property from COVID-19, the Fifth Circuit's opinion in *Terry Black's* joined several other jurisdictions, including the Second, Sixth, Seventh, Eighth, Ninth, Tenth, and Eleventh Circuits.  *See 10012 Holdings, Inc. v. Sentinel Ins. Co., Ltd.*, 21 F.4th 216, 222–23 (2d Cir. 2021) (concluding "direct physical loss" does not extend to loss of use but requires physical damage); *Santo's Italian Café LLC v. Acuity Ins. Co.*, 15 F.4th 398, 401 (6th Cir. 2021) ("Whether one sticks with the terms themselves (a 'direct physical loss of' property) or a thesaurus-rich paraphrase of them (an 'immediate' 'tangible' 'deprivation' of property), the conclusion is the same."); *Sandy Point Dental, P.C. v. Cincinnati Ins. Co.*, 20 F.4th 327, 333 (7th Cir. 2021) ("'[D]irect physical loss' requires a physical alteration to property."); *Oral Surgeons, P.C. v. Cincinnati Ins. Co.*, 2 F.4th 1141, 1144 (8th Cir. 2021) ("[T]here must be some physicality to the loss or damage of property—e.g., a physical alteration, physical contamination, or physical destruction."); *Mudpie, Inc. v. Travelers Cas. Ins. Co. of Am.*, 15 F.4th 885, 892 (9th Cir. 2021) (concluding "California courts would construe the phrase 'physical loss of or damage to' as requiring an insured to allege physical alteration of its property"); *Goodwill Indus. of Cent. Okla., Inc. v. Philadelphia Indem. Ins. Co.*, 21 F.4th 704, 710 (10th Cir. 2021) ("[A] 'direct physical loss' requires an immediate and perceptible destruction or deprivation of property."); *Gilreath Fam. & Cosm. Dentistry, Inc. v. Cincinnati Ins. Co.*, No. 21-11046, 2021 WL 3870697, at *2 (11th Cir. 2021).

In *Cinemark Holdings, Inc.*, the district court recognized that although the Fifth Circuit had not yet defined "physical damage," courts have relied on the definition used in *Terry Black's* to conclude that the ordinary and generally accepted meaning of "physical damage" likewise requires a tangible harm to the insured property.  2023 WL 2588548, at *6; *see also LNY 5003 LLC v. Zurich Am. Ins. Co.*, 631 F. Supp. 3d 431, 435 (S.D. Tex. Sept. 28, 2022) (noting the ordinary and common meaning of physical damage requires a tangible harm to the insured property).

[2] *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938).

[3] The Fifth Circuit denied Terry Black's motion to certify the question to the Supreme Court of Texas. 22 F.4th at 455 n.5.

(concluding nothing physical or tangible happened to the restaurants at all and noting plaintiffs always had ownership of, access to, and the ability to use all physical parts of the restaurants at all times). COVID-19 poses a risk to individuals, but it is ultimately a transitory virus that poses no long-term risk to inanimate property. *Ferrer & Poirot, GP v. Cincinnati Ins. Co.*, 36 F.4th 656, 658 (5th Cir. 2022) (per curiam) (applying Texas law). "While COVID-19 has wrought great physical harm to people, it does not physically damage property within the plain meaning of 'physical.'" *Id.*

Relying on this case law, Continental asserts COVID-19 does not cause direct physical loss of or damage to property. Simply stated, Continental maintains nothing physical or tangible happened to the restaurants as a result of COVID-19 because UJB continued to have "ownership of, access to, and the ability to use all of the physical parts of the restaurants at all times." To support its argument, Continental presented evidence from UJB witnesses that nothing within the restaurants changed as a result of the pandemic. Nothing was missing or functionally different, and UJB did not buy or replace anything such as chairs, tables, or barstools. For example, Jason Clarke, a regional director in Atlanta, testified tables functioned the same but, "I would say they were broken because there was no one there spending money. But in physical - - in their physical capacity, they were not damaged." Further, the parties stipulated:

No fact witness for Plaintiffs has personal knowledge of any property at any covered restaurant location that was different in appearance or potential function, or that was missing or no longer in Plaintiffs' physical possession, because of the presence of the coronavirus at the time the restaurant first reduced indoor dining capacity, discontinued indoor dining, and/or discontinued outdoor dining in or around March 2020.

Despite Continental's evidence and the overwhelming body of case law, UJB encourages this Court not to "follow the herd" because the federal cases are non-binding, distinguishable, "and all based on judicial fact-finding rather than factual and scientific evidence (which was either not presented or disregarded), flawed reasoning, or no reasoning at all." UJB contends it presented more than a scintilla of evidence, through its expert testimony, to create a fact issue as to whether COVID-19 particles caused physical loss of or damage to its restaurants.[4]

Rommie E. Amaro, a biochemist, explained in her expert report that the combination of virus-plus-surface creates a new substance, called a fomite, that is infectious and dangerous. The strength of the interactions between a viral particle and a surface is governed by the types and quantities of the interactions formed, the unique characteristic of the virus, and the properties of the surfaces themselves. She stated, "Viruses generally, including SARS-CoV-2, interact with (i.e., adsorb or adhere to) surfaces" through noncovalent interactions.

---

[4] To the extent UJB directs us to a Houston district court case wherein the court denied an insurer's summary judgment based on claims similar to those at issue here and the case proceeded to trial, we note that the Fourteenth Court of Appeals has not yet considered the appeal. *See Lloyd's Syndicate 1967 Subscribing to Pol'y B0180PG1922227 et al. v. Baylor College of Medicine*, No. 14-22-00925-CV (submitted December 7, 2023).

She stated, "[W]hen a surface becomes a fomite, it becomes an active source of potential infection and unsuitable for normal use until restored to satisfactory conditions." She concluded that "most common surfaces that have SARS-CoV-2 bound to them will have different physical, measurable properties than similar surfaces without the virus." These fomites can be seen under a microscope. "Such surfaces—now modified by the physical attachment of viral properties—are damaged by becoming realistic vectors of concern in disease transmission." But, Amaro also explained fomites can be deactivated or removed with manual cleaning and disinfecting and they deactivate on their own over time. Thus, the transmission risk from a single touch of a surface is "generally low."

David Dodge, a scientist specializing in applied toxicology research, opined that most, if not all, authoritative organizations have recommended cleaning and disinfecting measures to address the risks from COVID-19 exposure via fomite transmission. He explained that cleaning and disinfecting significantly reduce viral loads on surfaces. He acknowledged, "Fomite transmission is now generally viewed as a less likely mode of transmission compared to inhalation and deposition, but nonetheless one that is plausible, and worthy of precautionary measures." Thus, Dodge explained that despite UJB's best practices for health and sanitation, and they employed many, UJB could only reduce the risk of fomite transmission because eliminating it was not feasible; as soon as an infected person walked into a restaurant, the virus could be transferred to a surface and create a fomite.

These opinions do not provide more than a scintilla of evidence to create a genuine issue of material fact regarding whether COVID-19 causes direct physical loss of or damage to property. Amaro acknowledged the noncovalent interactions that cause particles to adsorb and adhere to surfaces, thereby forming fomites, are not unique to COVID-19. She indicated "*viruses generally*, including SARS-CoV-2" react accordingly. To ignore Amaro's concession regarding the similarity between COVID-19 and other viruses and conclude that fomites cause physical damage to or loss of property would result in any airborne virus, such as the common cold, triggering coverage. If such were the case, property everywhere would be in a constant state of damage or loss. For these reasons, courts have rejected similar arguments in the context of insurance coverage disputes regarding COVID-19. *See, e.g.*, *Cinemark Holdings*, 2023 WL 2588548, at *8 (holding the presence of COVID-19 fomites did not cause physical loss or damage within the meaning of the policies as a matter of law because to hold otherwise "would render every sneeze, cough, or exhale a tangible alteration or deprivation of property"); *see also Cosm. Laser, Inc. v. Twin City Fire Ins. Co.*, 554 F. Supp. 3d 389, 407 (D. Conn. 2021) (stating plaintiff's theory "renders every sneeze, cough or even exhale a structural change," and "[t]hat cannot be right").

Moreover, a property has not experienced "physical loss" or "physical damage" when all that is required from the property owner is cleaning the surfaces or simply waiting several days for the alleged physical alteration to resolve itself.

–14–

*See, e.g.*, *Cinemark Holdings*, 2023 WL 2588548, at *8 (noting COVID-19 particles do not cause long-lasting change to the physical character of any property); *Vandelay Hosp. Grp. LP v. Cincinnati Ins. Co.*, No. 3:20-CV-1348-D, 2021 WL 2936066, at *6 (N.D. Tex. 2021) ("The virus does not threaten the structures covered by property insurance policies and can be removed from surfaces with routine cleaning and disinfectant."). COVID-19 does not linger on surfaces forever. Significantly, although COVID-19 continues to circulate through communities, UJB continues to operate its restaurants using the same property it alleged was physically damaged or lost.

Similarly, to the extent the Policy covers air, we reject UJB's argument its property suffered physical loss or damage because of COVID-19 circulating inside the restaurants. In *Lamacar Inc. v. Cincinnati Casualty Company*, the court considered the "numerous scientific studies" purporting to illustrate how the virus "can physically bond with, alter, and contaminate [various materials] leaving such property susceptible to further transmission of COVID-19." No. 3:21:CV-1396-S, 2022 WL 227162, at *2 (N.D. Tex. Jan. 26, 2020) (mem. op. and order). The court concluded the lengthy descriptions of how the virus physically altered the composition of air was insufficient to "plausibly allege the virus caused direct physical damage to property." *Id.* at *4; *see also E. Coast Ent. of Durham, LLC v. Houston Cas. Co.*, 31 F.4th 547, 551 (7th Cir. 2022) (concluding "the existence of airborne particles carrying the virus" did not physically alter property). UJB cites

–15–

several cases in which other courts have recognized air as insured property that can be physically damaged. However, these cases do not involve COVID-19, and we disagree with their analysis. *Cf. Or. Shakespeare Festival Ass'n v. Great Am. Ins. Co.*, No. 1:15-CV-01932-CL, 2016 WL 3267247, at *6 (D. Or. 2016) (finding property physically damaged by smoke), *vacated on other grounds*, No. 1:15-CV-01932-CL, 2017 WL 1034203 (D. Or. 2017); *TRAVCO Ins. Co. v. Ward*, 715 F. Supp. 2d 699, 709 (E.D. Va. 2010) (concluding home suffered direct physical loss because toxic gases released by Chinese drywall rendered home uninhabitable), *aff'd*, 504 Fed. Appx. 251 (4th Cir. 2013). *But see, e.g.*, *Q Clothier New Orleans, L.L.C. v. Twin City Fire Ins. Co.*, 29 F.4th 252, 259 (5th Cir. 2022) (distinguishing insured's reliance on drywall cases because property did not need to be removed or replaced and COVID-19 did not make the stores inherently dangerous or uninhabitable like the emission of sulfur gas from drywall).

Taking the evidence favorable to UJB as true, indulging every reasonable inference in its favor, and resolving any doubts in its favor, we conclude UJB has not presented more than a scintilla of evidence to create a genuine issue of material fact that COVID-19 caused "direct physical loss of or damage to" its property, meaning the virus caused a distinct, demonstrable, physical alteration to the restaurants. *Ortiz*, 589 S.W.3d at 131 (summary judgment standard of review); *Great Am. Ins. Co. of N.Y.*, 2020 WL 7393321, at *14 (recognizing an intangible or incorporeal loss unaccompanied by a distinct, demonstrable, and physical alteration

of property is not a direct physical loss); *DZ Jewelry, LLC v. Certain Underwriters at Lloyds London*, 525 F. Supp. 3d 793, 799 (S.D. Tex. 2021) (noting courts considering similar claims have repeatedly stated COVID-19 does not cause physical damage to property). In reaching this conclusion, we are mindful of and persuaded by other courts' interpretations of similar or identical policy language as we "strive for uniformity in construing insurance provisions." *RSUI Indem. Co.*, 466 S.W.3d at 118. Accordingly, the trial court did not err by granting summary judgment on the following coverage provisions: Business Interruption,[5] Denial of Access by Civil Authority,[6] Ingress-Egress,[7] Contingent Business Interruption,[8] and Extra-Expense[9] as each provision requires a "direct physical loss of or damage to covered property" to trigger coverage. However, even if UJB had raised a fact issue about whether COVID-19 damaged UJB's property, as explained below, summary judgment was still appropriate based on the following coverage provisions: Business Interruption, Expenses Related to Costs, Extended Period of Indemnity, Civil

---

[5] "This policy covers against loss resulting from necessary interruption of business caused by direct physical loss of or damage to covered property."

[6] The policy covers actual loss sustained "during the period of time while access to the Insured's *Location* is prohibited by order of civil authority, but only when such order is given as a direct result of physical loss or damage to property of the type insured from a peril insured against occurring at or in the immediate vicinity of said *Location*."

[7] The policy covers actual loss sustained "during the period of time when as a direct result of physical loss or damage to property . . . , ingress to or egress from the Insured's *Location* is thereby physically prevented."

[8] "[T]he policy is extended to pay for loss resulting from necessary interruption of business . . . caused by direct physical loss or damage."

[9] "The Company will pay for the reasonable and necessary extra expense . . . incurred by the Insured in order to continue as nearly as practicable the *normal* operations of the Insured's business following direct physical loss of or damage to covered property . . . ."

Authority and Ingress-Egress, Contingent Business Interruption, Professional Fees, Leasehold Interest, and Loss Adjustment Expense.

## B. Business Interruption

The Business Interruption provision covers losses "resulting from interruption of business caused by direct physical loss of or damage to covered property," with some exceptions inapplicable to our analysis. The record does not raise a fact issue showing UJB suffered any necessary business interruption *caused* by direct physical loss of or damage to property. Rather, UJB discontinued on-premises dining because of government mandates and the financial struggles at certain locations because of the pandemic. These two independent reasons—not any direct physical loss of or damage to property because of the presence of COVID-19—caused the business interruption.

For example, a March 14, 2020 email stated, "Closing is increasingly becoming an option, particularly in urban environments. It protects the brand and at some level makes it simple and clear. Also makes the landlord negotiations easier." Some restaurants were underperforming before the pandemic. Internal UJB emails indicated executives considered using the crisis as a bargaining tool with landlords for rent deferrals because "[w]e can claim the crisis left us unable to re-open and operate certain locations given a multitude of reasons." One restaurant successfully got out of its lease, which was a financial decision, not one spurred by direct physical loss of or damage to property.

On March 17, 2020, Uncle Julio's executives distributed two emails announcing restaurant closures:

- With an abundance of caution, we have made the difficult decision to temporarily close all of our Uncle Julio's locations. We have been challenged balancing our team['s] ability to earn income; our commitment to serve guests; and our need to manage the finances of the business. Ultimately, our team, our community and our guest safety always comes first.

- Today we are officially closing the Uncle Julio's RSC until further notice . . . . This decision is being driven by Dallas County closing all restaurants, bars and public gatherings of 50 or more.

In a March 18, 2020 email, Tom Vogel, Uncle Julio's CEO, stated that COVID-19 had an unprecedented negative impact on restaurants, and despite doing "the best we could to try and remain open for business . . . we had no choice but to close thirty restaurants based on state and local mandates." Subsequently, Uncle Julio's closed fourteen more "to follow CDC and federal guidelines for social distancing." Vogel further stated closing certain locations may be necessary in areas "where closing will be so common that it could be viewed as irresponsible to remain open." Other restaurants were later closed "due to a lack of takeout business." Bartaco's Florida regional director stated in his deposition that the Florida locations discontinued indoor dining because they were required to by a March 20, 2020 executive order.

Thus, the evidence shows UJB did not suffer any business interruption *caused* by a direct physical loss of or damage to the property. Rather, other factors caused the business interruption. In reaching this conclusion, we reject UJB's attempt to

–19–

create a fact issue by relying on executive orders indicating in-person dining was closed because of physical loss of or damage to property. UJB refers to "many" such orders but only cites one order issued by Dallas County Judge Clay Jenkins. In a footnote, UJB cites to over one-hundred fifty pages of the Clerk's Record for other "applicable orders expressly referencing property loss or damage." While we do not have an independent duty to review voluminous records, we reviewed those papers and found only one other order referencing loss of or damage to property—a Harris County order from March 20, 2020.

Both orders stated they were necessary because "the virus is physically causing property damage due to its proclivity to attach to surfaces for prolonged periods of time" (Dallas County order) and "the COVID-19 virus causes property loss or damage due to its ability to attach to surfaces for prolonged periods of time" (Harris County order). The focus of both orders, however, like the other executive orders from around the country, was the necessity "to protect the lives, health, and safety of the [Dallas] County's residents from the devastating impacts of the pandemic." It was "essential that the spread of the virus be slowed to protect the ability of public and private health care to handle the influx of new patients and safeguard public health and safety." The overall purpose of the Dallas County order was to slow the spread of the virus to protect people, not property. *See, e.g.*, *Terry Black's*, 22 F.4th at 459 (civil orders restricting dine-in restaurant service did not cause direct physical loss of property and "were enacted to *avoid* exposure to

–20–

COVID-19, not *because of* exposure" and to take measures to contain and to prevent the spread); *NTT DATA Int'l LLC v. Zurich Am. Ins. Co.*, No. 3:21-CV-890-S, 2022 WL 196533, *6 (N.D. Tex. 2022) (concluding civil orders responding to risks posed by global pandemic do not satisfy policy requirement that losses result from direct physical loss of or damage to property).

Accordingly, UJB failed to present evidence creating a fact issue that its restaurants' business interruptions were caused by direct physical loss of or damage to property, and the trial court did not err by granting the motion for summary judgment.[10]

### C. Civil Authority and Ingress-Egress Provisions

Under the Civil Authority provision, for coverage to arise, access to UJB's restaurants must be "prohibited by order of civil authority" that was given "as a direct result of physical loss or damage to property . . . at or in the immediate vicinity" of the restaurants. The Fifth Circuit has interpreted similar civil authority provisions to require "a nexus between the civil authority order and property damage

---

[10] Summary judgment was also appropriate under the Expense Related to Reducing Loss provision because it covers "expenses as are necessarily incurred for the purpose of reducing a <u>Time Element</u> loss . . . ." Business Interruption is a "time element" loss under the Policy.

Similarly, the Extended Period of Indemnity provision covers loss "sustained by the Insured resulting directly from the interruption of business." Thus, summary judgment was also appropriate on this claim.

Finally, summary judgment was appropriate on the Contingent Business Interruption provision, which covers "loss resulting from necessary interruption of business . . . caused by direct physical loss or damage to" any real or personal property of (a) "direct suppliers or service providers," (b) "direct customers" and (c) "property operated by others . . . to attract customers . . . within five miles." Because UJB is not entitled to coverage under the Business Interruption provision, it likewise is not entitled to coverage under the Contingent Business Interruption provision. Moreover, UJB never alleged or provided facts showing any physical loss or damage to suppliers, service providers, customers, or dependent property of the restaurants.

or losses near the insured premises." *Q Clothier New Orleans, L.L.C.*, 29 F.4th at 260 (citing *Dickie Brennan & Co. v. Lexington Ins. Co.*, 636 F.3d 683, 686 (5th Cir. 2011) (interpreting provision using "due to" as requiring a nexus under Louisiana law)).

In *Q Clothier*, the insured argued the civil authority extension in its insurance policy covered its loss of business income after state and local officials required it to close in response to the pandemic. *Id.* at 256. The court determined "the direct result of" language in the policy required Q Clothier to allege a plausible causal relationship between the order of civil authority and damage or loss to its property. *Id.* at 260. The court rejected Q Clothier's claim that the civil authority orders were issued because of damage to or loss of property near its stores. *Id.* Rather, because the orders called for preventative measures to avoid damage and contamination from COVID-19, the civil authority orders were a "direct result" of "the global pandemic and the need to take measures to contain and prevent the spread of COVID-19." *Id.* (citing *Terry Black's*, 22 F.4th at 458–59).

The Fifth Circuit's reasoning is sound, and we reach the same conclusion. Although the Dallas County April 6, 2020 executive order issued by Judge Clay Jenkins referenced the virus "causing property damage due to its proclivity to attach to surfaces for prolonged periods of time," UJB provided no evidence the order was given as a direct result of physical loss of or damage to property occurring "at or in the immediate vicinity" of any of its restaurants. Rather, it was issued to prevent

–22–

exposure to COVID-19, not because of exposure to COVID-19. *See, e.g., Terry Black's*, 22 F.4th at 458–59. In fact, the order states as much in its declarations:

> WHEREAS, this Emergency Order is necessary to protect the lives, health, welfare, and safety of the County's residents from the devastating impacts of this pandemic: . . .
>
> [I]t is essential that the spread of the virus be slowed to protect the ability of the public and private health care providers to handle the influx of new patients and safeguard public health and safety. Because of the risk of the rapid spread of the virus, and the need to protect the most vulnerable members of the community, this Order requires all individuals anywhere in Dallas County to shelter in place . . . .

But for one passing statement about property damage, the crux of the order was to protect people from the virus. Thus, even if UJB raised a fact issue that COVID-19 caused physical loss of or damage to the restaurants, summary judgment was proper because of the absence of a causal link between the issuance of the civil authority order and direct physical loss of or damage to property at or in the immediate vicinity of UJB's restaurants.

Under the Ingress-Egress provision, the Policy covered actual loss sustained as a "direct result" of physical loss or damage to property during the time ingress and egress was "physically prevented." The evidence conclusively establishes UJB's employees were never physically prevented from entering or exiting the restaurants. To the contrary, Shari Tessler, with Uncle Julio's in Orlando, testified employees used one restaurant as a call center to manage the influx of to-go orders while the restaurants were closed for in-person dining. Neither a governmental authority nor UJB instructed employees not to access the restaurant. Jason Clarke,

–23–

with Bartaco in Georgia, testified there was not a time when employees were not permitted access to the restaurants when they were open only for takeout and delivery; rather, managers and employees were free to go in as needed. Scott Lawton, the president and CEO of Bartaco, admitted there were "rare occasions" Bartaco might let a patron come inside the restaurant "such as a rainy day." Accordingly, even if COVID-19 caused a physical loss or damage to the restaurants, access to the UJB's restaurants was not prohibited. Therefore, the trial court did not err by granting summary judgment on this basis.

### D. Professional Fee Coverage

The Professional Fee provision covers "the fees of architects, surveyors, consulting engineers and fees of other professionals necessarily incurred in the work of repairing or rebuilding the property following a loss." Numerous UJB witnesses testified they did not need to rebuild or repair any part of the restaurants because of COVID-19. Rather, items such as tables, chairs, silverware, and barstools functioned the same as before the pandemic and did not need replacing. UJB likewise stipulated no fact witness had personal knowledge that any covered property "was different in appearance or potential function" because of the presence of COVID-19. Further, UJB presented no evidence that architects, surveyors, consulting engineers, or other professionals were engaged to repair or rebuild any property. Accordingly, the trial court did not err by granting summary judgment on this coverage provision.

–24–

### E. Leasehold Interest

The Leasehold Interest provision provides coverage for actual loss for "actual rent which remains payable for the unexpired term of the lease if such property becomes wholly untenable or unusable." UJB presented no evidence that its restaurants became "wholly untenable or unusable" during the pandemic. Accordingly, the trial court did not err by granting summary judgment on this coverage provision.

### F. Loss Adjustment Expense

The Loss Adjustment Expense provision covers "reasonable expenses incurred by the Insured in preparing claim data when required by Insurer." Because Continental has maintained the Policy did not provide coverage, it never required or sought any claim data such as "inventories, obtaining appraisals and preparing other documentation to show the extent of the loss." Thus, UJB did not incurr any expenses to prepare claim data. Accordingly, the trial court did not err by granting summary judgment on this coverage provision.

### G. Extracontractual Claims

Finally, UJB brought claims for bad faith and other unfair insurance practices. As a general rule, there can be no claim for bad faith when an insurer promptly denied a claim that is in fact not covered. *See JAW The Point, L.L.C. v. Lexington Ins. Co.*, 460 S.W.3d 597, 602 (Tex. 2015); *Alaniz v. Sirius Int'l Ins. Corp.*, 626 Fed. App'x 73, 79 (5th Cir. 2015) (concluding extracontractual claims pursuant to

–25–

common law and Texas Insurance Code failed because the breach of contract claim from which they arose failed). Because summary judgment was proper on UJB's coverage claims, UJB's arguments as to its extracontractual claims necessarily fail. *See Nicholas Petroleum, Inc. v. Mid-Continent Cas. Co.*, No. 05-13-01106-CV, 2015 WL 4456185, at *6 (Tex. App.—Dallas July 21, 2015, no pet.) (mem. op.). Accordingly, the trial court did not err by granting summary judgment on UJB's claims for breach of the implied covenant of good faith and fair dealing and violations of the Texas Insurance Code for (1) unfair methods of competition and unfair or deceptive acts or practices (2) and prompt payment of claims.

## Conclusion

We affirm the trial court's judgment.

/Erin A Nowell/
ERIN A. NOWELL
JUSTICE

230116F.P05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

JULIO & SONS COMPANY; BARTECA RESTAURANTS, LLC; UNCLE JULIO'S ANNAPOLIS CONCESSIONS, LLC; UNCLE JULIO'S COLUMBIA CONCESSIONS, LLC; UNCLE JULIO'S CORPORATION; UNCLE JULIO'S OF FLORIDA, INC.; UNCLE JULIO'S OF GEORGIA, INC; UNCLE JULIO'S OF ILLINOIS, INC.; UNCLE JULIO'S OF RESTON, INC.; UNCLE JULIO'S OF TENNESSEE, INC.; UNCLE JULIO'S OF TEXAS, INC.; UNCLE JULIO'S RIO GRANDE CAFÉ, INC.; CONROE FOODS, INC.; HACIENDA II PARTNERS, LLP; SOUTHWEST RESTAURANT PARTNERS, LLLP; THE MEXICAN RESTAURANT, INC.; 15-16 LLC; 2004 RESTAURANT, LLC; 2016 RESTAURANT, LLC; 971 FARMINGTON, LLC; BARTACO PORT CHESTER, LLC; BARTACO STAMFORD, LLC; BARTACO 12

On Appeal from the 44th Judicial District Court, Dallas County, Texas Trial Court Cause No. DC-21-02194. Opinion delivered by Justice Nowell. Justices Miskel and Kennedy participating.

SOUTH, LLC; BARTACO AVENTURA, LLC; BARTACO BALLSTON, LLC; BARTACO CHAPEL HILL, LLC; BARTACO CLOUD KITCHEN WMT, LLC; BARTACO DEERFIELD, LLC; BARTACO DR. PHILLIPS, LLC; BARTACO FORT POINT, LLC; BARTACO HILLDALE, LLC; BARTACO HYDE PARK, LLC; BARTACO INMAN PARK, LLC; BARTACO KOP, LLC; BARTACO MARIETTA, LLC; BARTACO MOSAIC, LLC; BARTACO NORTH HILLS, LLC; BARTACO PEARL WEST, LLC; BARTACO RESTON, LLC; BARTACO ROSWELL, LLC; BARTACO TEJON, LLC; BARTACO WASHINGTON DC, LLC; BARTACO WESTPORT, LLC; AND BARTACO WYNWOOD, LLC, Appellants

No. 05-23-00116-CV      V.

CONTINENTAL CASUALTY COMPANY, Appellee

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

It is **ORDERED** that appellee CONTINENTAL CASUALTY COMPANY recover its costs of this appeal from appellants JULIO & SONS COMPANY, BARTECA RESTAURANTS, LLC; UNCLE JULIO'S ANNAPOLIS CONCESSIONS, LLC; UNCLE JULIO'S COLUMBIA CONCESSIONS, LLC; UNCLE JULIO'S CORPORATION; UNCLE JULIO'S OF FLORIDA, INC.;

–28–

UNCLE JULIO'S OF GEORGIA, INC; UNCLE JULIO'S OF ILLINOIS, INC.; UNCLE JULIO'S OF RESTON, INC.; UNCLE JULIO'S OF TENNESSEE, INC.; UNCLE JULIO'S OF TEXAS, INC.; UNCLE JULIO'S RIO GRANDE CAFÉ, INC.; CONROE FOODS, INC.; HACIENDA II PARTNERS, LLP; SOUTHWEST RESTAURANT PARTNERS, LLLP; THE MEXICAN RESTAURANT, INC.; 15-16 LLC; 2004 RESTAURANT, LLC; 2016 RESTAURANT, LLC; 971 FARMINGTON, LLC; BARTACO PORT CHESTER, LLC; BARTACO STAMFORD, LLC; BARTACO 12 SOUTH, LLC; BARTACO AVENTURA, LLC; BARTACO BALLSTON, LLC; BARTACO CHAPEL HILL, LLC; BARTACO CLOUD KITCHEN WMT, LLC; BARTACO DEERFIELD, LLC; BARTACO DR. PHILLIPS, LLC; BARTACO FORT POINT, LLC; BARTACO HILLDALE, LLC; BARTACO HYDE PARK, LLC; BARTACO INMAN PARK, LLC; BARTACO KOP, LLC; BARTACO MARIETTA, LLC; BARTACO MOSAIC, LLC; BARTACO NORTH HILLS, LLC; BARTACO PEARL WEST, LLC; BARTACO RESTON, LLC; BARTACO ROSWELL, LLC; BARTACO TEJON, LLC; BARTACO WASHINGTON DC, LLC; BARTACO WESTPORT, LLC; AND BARTACO WYNWOOD, LLC.


Judgment entered July 3, 2024.